**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Brandon Snow, Trustee of the Teamsters Local 786 Building Material, Chauffeurs, Teamsters and Helpers Welfare Fund and Teamsters Local 786 Lumber Employees Retirement Fund, <br><br> Plaintiff, <br><br> v. <br><br> R WAY TRUCKING, INC., an Illinois corporation, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | NO.: 1:25-cv-07305 <br><br><br> The Honorable Judge Georgia N. Alexakis |

## FIRST AMENDED COMPLAINT

Plaintiff, Brandon Snow ("Snow" or "Trustee"), as Trustee of the Teamsters Local 786 Building Material Chauffeurs, Teamsters and Helpers Welfare Fund ("Welfare Fund") and Teamsters Local 786 Lumber Employees Retirement Fund (herein "Lumber Fund") (collectively the "Funds"), by and through his attorneys, VINCENT D. PINELLI and COLIN M. CHENOWETH, complains against the Defendant, R WAY TRUCKING, INC., an Illinois corporation, and in support thereof states as follows:

1. Jurisdiction and venue are based upon sections 502(a), (e), and (f) of the *Employee Retirement Income Security Act of 1974, as amended* ("ERISA"), 29 U.S.C. §§ 1132(a), (e), and (f), as more fully appears herein.

2. The Welfare Fund and Lumber Funds are multi-employer employee benefit plans within the meaning of Sections 3(3) and (37) of ERISA, 29 U.S.C. §§ 1002(3) and (37), and maintains their principal place of operation at 300 South Ashland Avenue, Chicago, Illinois.

3. Plaintiff Snow is a Trustee of the Welfare Fund and Trustee of the Lumber Fund; is a fiduciary within the meaning of Section 3(21) of ERISA, 29 U.S.C. §1002(21); and has been authorized by the Trustees of the Welfare Fund and the Lumber Fund to bring this action on behalf of the Funds.

4.      R Way Trucking, Inc., ("Employer") is an Illinois corporation which maintains its principal place of business within this judicial district and is an employer within the meaning of Section 3(5) of ERISA, 29 U.S.C. §1002(5).

5.      Teamster Local 786 Building Material Chauffeurs, Teamsters and Helpers Welfare Fund is an employee organization within the meaning of Section 3(4) of ERISA, 29 U.S.C. §1002(4).

6.      Teamsters Local 786 Lumber Employees Retirement Fund is an employee organization within the meaning of Section 3(4) of ERISA, 29 U.S.C. §1002(4).

7.      Pursuant to Article 7(1)(c) of a Collective Bargaining Agreement effective June 1, 2023, through May 31, 2027 (the "Agreement"), Employer, the Welfare Fund, and the Lumber Fund are parties and bound to said Agreement. A copy of the Agreement is attached hereto as **Exhibit A**.

8.      Pursuant Article 7(1)(c) Employer agreed that is was bound and is a party to the Trust Agreement creating the Health and Welfare Fund and the Lumber Retirement Pension Fund, and all prior and subsequent amendments thereto, as if it had signed the original copy of each of the said Trust Agreements.

## COUNT I

9.      Pursuant to Article 25 of the Agreement, Employer is required to provide records necessary to ascertain that appropriate contributions to the Welfare Fund and Lumber Fund are being collected correctly and being paid in full.

10.      A letter was sent to Employer on May 1, 2024, requesting Employer to produce records necessary for an audit. A copy of the May 1, 2024; letter is attached hereto as **Exhibit B**. The Employer did not provide the requested documents. Employer was again asked to provide specific documents in a letter dated March 25, 2025. A copy of the March 25, 2025, letter is attached hereto as **Exhibit C**. On April 11, 2025 Plaintiff's counsel sent another letter to Employer giving a final written request from the

Funds seeking compliance with Agreement. A copy of the April 11, 2025, letter is attached hereto as **Exhibit D**.

11. Notwithstanding the above obligation, the Employer has failed and refused to provide the requested records for review as required under Article 25 of the Agreement.

WHEREFORE, Plaintiff, Brandon Snow. as Trustee of the Teamsters Local 786 Building Material Chauffeurs, Teamsters and Helpers Welfare Fund and Teamsters Local 786 Lumber Employees Retirement Fund, respectfully requests that this Court issue an order against Defendant R WAY TRUCKING, INC., an Illinois corporation, granting the following relief:

A. A judgment against Defendant requiring that it provide necessary records to complete an audit of contributions paid and owed within 10 business days.

B. A judgment on behalf of Plaintiff Trustee for reasonable attorneys' fees, audit fees, and the costs of this action;

C. An order that this Court will retain jurisdiction of this cause pending compliance with its Orders; and

D. For such further and additional relief as may be necessary.

## COUNT II

12. Plaintiff realleges and incorporates paragraphs 1 through 11 as if fully restated herein.

13. Pursuant to Article 7 of the Agreement, R WAY TRUCKING, INC. is required to make timely contributions to the Funds on behalf of the employees represented by Local 786 and to provide records necessary to ascertain the appropriate contributions have been made to the Welfare Fund.

14. Notwithstanding the above obligations, R WAY TRUCKING, INC. has failed to timely remit contributions and is currently delinquent in an amount of $67,888.74 to the Local 786 Welfare Fund thereby depriving the Funds of contributions and income and jeopardizing the benefits of participants and beneficiaries, in violation of Sec. 515 of ERISA, 29 U.S.C. 1145.

15. Pursuant to ERISA Section 502(g)(2), 29 U.S.C. 1132(g), the Employer is indebted to the Health and Welfare Fund for contributions, as well as penalties, attorney's fees, costs, and interest as provided by law and the provisions of the Agreement.

16. Pursuant to an audit performed on March 20, 2026, and attached hereto as **Exhibit E**, R WAY TRUCKING, INC. owes $67,888.74 to the Local 786 Welfare Fund.

17. Pursuant to Article 8 of the Agreement, R WAY TRUCKING, INC. is required to make timely contributions to the Lumber Funds on behalf of the employees represented by Local 786 and to provide records necessary to ascertain the appropriate contributions have been made to the Lumber Fund.

18. Notwithstanding the above obligations, the Employer has failed to timely remit contributions and is currently delinquent in an amount of $48,778.08 to the Local 786 Lumber Fund thereby depriving the Funds of contributions and income and jeopardizing the benefits of participants and beneficiaries, and violating Sec. 515 of ERISA, 29 U.S.C. 1145.

19. Pursuant to ERISA Section 502(g)(2), 29 U.S.C. 1132(g), the Employer is indebted to the Lumber Fund for contributions, as well as penalties, attorney's fees, costs, and interest as provided by law and the provisions of the Agreement.

20. Pursuant to an audit performed on March 20, 2026, and attached hereto as **Exhibit F**, R WAY TRUCKING, INC. owes $48,778.08 to the Local 786 Lumber Fund.

WHEREFORE, Plaintiff, Brandon Snow. as Trustee of the Teamsters Local 786 Building Material Chauffeurs, Teamsters and Helpers Welfare Fund and Teamsters Local 786 Lumber Employees Retirement Fund, respectfully requests that this Court issue an order against Defendant R WAY TRUCKING, INC., an Illinois corporation, granting the following relief:

A. A judgment on behalf of Plaintiff Trustee for such amounts as may be determined to be due and owing from R WAY TRUCKING, INC. to the Welfare Fund to date, and for any such amounts as become due during the pendency of this proceeding;

B.  A judgment on behalf of Plaintiff Trustee for such amounts as may be determined to be due and owing from R WAY TRUCKING, INC. to the Lumber Fund to date, and for any such amounts as become due during the pendency of this proceeding;

C.  A judgment on behalf of Plaintiff Trustee for double interest on the amount of delinquent contributions, reasonable attorney's fees and the costs of this action;

D.  An Order that this Court will retain jurisdiction of this cause pending compliance with its Orders; and

E.  For such other and additional relief as may be necessary.

**DATED** this 4th day of June 2026.

Respectfully submitted,

__/s/ Vincent D. Pinelli_____
**VINCENT D. PINELLI**
Attorney for Plaintiff

Vincent D. Pinelli
vpinellie@bbp-chicago.com
Colin M. Chenoweth
cchenoweth@bbp-chicago.com
**BURKE BURNS & PINELLI, LTD.**
70 West Madison Street, Suite 4300
Chicago, Illinois 60602
(312) 541-8600
Firm ID: 29282

# TEAMSTERS LOCAL 786

## BY AND BETWEEN

## R WAY TRUCKING INC.

## AND

**BUILDING MATERIAL, LUMBER, BOX, SHAVING, ROOFING AND INSULATING CHAUFFEURS, TEAMSTERS, WAREHOUSEMEN AND HELPERS, AND RELATED INDUSTRY EMPLOYEES, WATCHMEN AND SECURITY GUARDS, RECYCLED AND RECYCLABLE BUILDING MATERIALS AND GREEN BUILDING PRODUCTS, CHICAGO AND VICINITY, ILLINOIS; AS WELL AS NOTIONS, CANDIES CIGAR, TOBACCO AND CIGARETTE SALESMEN, DRIVERS, HELPERS AND INSIDE WORKERS AND VENDING MACHINE DRIVERS, SERVICEMEN AND INSIDE WORKERS, CHICAGO, ILLINOIS, UNION LOCAL 786**

**AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND TEAMSTERS JOINT COUNCIL NO. 25**



## TERM OF AGREEMENT

**June 1, 2023 Through May 31, 2027**

# EXHIBIT A

## TABLE OF CONTENTS

Article 1 - RECOGNITION AND SCOPE OF AGREEMENT ................................................................. 3

Article 2- UNION SECURITY ........................................................................................................4

Article 3 - SUBCONTRACTING................................................................................................... 4

Article 4 - NO STRIKES OR LOCKOUTS ..................................................................................... 5

Article 5 - GRIEVANCES AND ARBITRATION ...............................................................................5

Article 6 - WAGES ....................................................................................................................7

Article 7- HEALTH AND WELFARE...................................................................................................9

Article 8 - LUMBER RETIREMENT PENSION FUND ................................................................. 12

Article 9 - CHECK-OFF .............................................................................................................. 14

Article 10- D.R.I.V.E. AUTHORIZATION AND DEDUCTION ...................................................... 14

Article 11 - WORKING HOURS AND OVERTIME ...................................................................... 14

Article 12- GENERAL CONDITIONS ......................................................................................... 16

Article 13 - ADDITIONAL DUTIES ............................................................................................ 17

Article 14 - NON-DISCRIMINATION ......................................................................................... 17

Article 15- EMPLOYMENT TERMINATION .............................................................................. 17

Article 16 - HOLIDAYS.............................................................................................................17

Article 17- VACATIONS AND LEAVES OF ABSENCE ............................................................... 18

Article 18 - OWNERS/DRIVERS............................................................................................... 19

Article 19 - BULLETIN BOARD ACCESS ................................................................................... 19

Article 20 - JOB ACCESS BY UNION-STEWARDS.................................................................... 19

Article 21 - PROTECTION OF RIGHTS .................................................................................... 20

Article 22- SEPARATE AGREEMENTS ..................................................................................... 20

Article 23 - COMPLIANCE WITH SAFETY AND TRAFFIC LAWS.............................................. 20

Article 24- ECONOMIC LOSS................................................................................................... 20

Article 25 - INSPECTION PRIVILEGES ..................................................................................... 21

Article 26 - EMERGENCIES...................................................................................................... 21

Article 27- SALES AND TRANSFERS-SCOPE OF OBLIGATION .............................................. 21

Article 28- CONFORMITY TO LAW-SAVINGS CLAUSE............................................................ 22

Article 29 - FUNERAL LEAVE .................................................................................................. 22

Article 30 - MILITARY LEAVE OF ABSENCE ............................................................................ 22

Article 31 - UNIFORM DRUG/ALCOHOL ABUSE POLICIES ..................................................... 22

Article 32 - UNIFORMS.............................................................................................................23

Article 33 - WORK RULES ........................................................................................................23

Article 34- DURATION AND TERMINATION ............................................................................. 24

# EXHIBIT A

This Agreement effective the 1st day of June 2023, by and between R WAY TRUCKING INC., hereinafter referred to as the "EMPLOYER" and Teamsters Local Union No. 786, an affiliate of the International Brotherhood of Teamsters, hereinafter referred to as the "UNION". This Agreement shall be known as the Area Wide Material Hauling/Heavy Highway Agreement.

## WITNESSETH

1. The purpose of this Agreement is to establish the hours, wages, and other conditions of employment and to adopt measures for the peaceful settlement of grievances and differences, and for the purpose of maintaining a cooperative relationship so that the Employers may secure sufficient capable workers who report to work on time and have as much continuous employment as possible.

2. It is mutually understood and agreed that the following terms relating to the wages, hours and working conditions of workers covered by this Agreement have been agreed upon by the means of Collective Bargaining, and that the following provisions will be binding upon the parties to this Agreement during the terms of this Agreement and any renewal period thereof.

## Article 1 - RECOGNITION AND SCOPE OF AGREEMENT

1. **Geographic Coverage:** The geographic area is the area covered by the I.B. of T. Local 786 Chicago and Vicinity which historically encompasses Cook County, Illinois and surrounding counties of Lake, DuPage, Kane, Kendall, Will, Grundy, McHenry, Kankakee, Iroquois, etc. within the jurisdiction of I.B. of T. Joint Council No. 25.

2. **Recognition:** The EMPLOYER recognizes the UNION, as the sole and exclusive bargaining agent with respect to rates of pay, hours of work and all other conditions of employment for all Employees covered by this Agreement.

3. **Bargaining Unit:** Employees covered by this Agreement are all Employees in the classifications of work covered by this Agreement, employed by the EMPLOYER in the contract territory and engaged in the work described in Article 1.4 hereof.

4. **Work Covered:** Jurisdiction. This Agreement shall apply to Employees in the work classifications herein set forth in the performance of work involved in the following operations:

   a. **Heavy Construction:** Heavy construction is defined as construction substantially in its entirety any fixed structure, any improvement or modification thereof, or an addition or repair thereto, including any structure which is an incidental part thereof, including without limitation, railroads and street railway construction project, sewers, water mains, grade separations, foundations, pile driving, piers, abutments, retaining highways, drainage projects, sanitation projects, aqueducts, irrigation projects, flood control projects, reclamation projects, reservoirs, water supply projects, water power development, hydroelectric development, duct lines, pipelines, locks, dams, dikes, levees, revetments, channels, channel cutoffs, intakes, dredging projects, jetties, breakwaters, docks, harbors, industrial sites, airports, excavation and disposal of earth, and rock.

   b. **Highway Construction Work:** Highway construction work is defined as all work ordinarily included in highway construction contracts, bridges, sewer and street grading, street paving, curb setting, sidewalks, etc. and landscaping.

# EXHIBIT A

c. **Heavy Equipment Hauling:** Low-Boy

d. **Material Haul:** Employees engaged in the work of transporting aggregate, building materials (excluding ready mix) and salt to, from and inside pits, yards, quarries, plants, factories, as well as to and from stockpiles.

e. **Articulating End-Dump Work**

## Article 2 - UNION SECURITY

1. **Maintenance of Membership:** Present Employees who are members of the UNION must, as a condition of employment, maintain such membership during the term of this Agreement.

2. **New Employees:** All new employees shall, as a condition of employment, become members of the UNION on the thirtieth (30th) day after the beginning of employment or after the execution date of this Agreement, whichever is later, and shall maintain such membership as a condition of continued employment. Once a month no later than the 10th day of each month after a new employee is hired, the EMPLOYER shall provide the UNION with a list of such new hires providing the Employee's full name, address, social security number, date of hire and the location where the Employee is assigned to report for work.

3. **Enforcement:** Any Employee who refuses or fails to fulfill the obligations of Articles 2.1 or 2.2 above shall forfeit his/her right of employment; and the EMPLOYER shall discharge such Employee within three (3) working days of receiving written notice from the UNION of the failure of an Employee to fulfill said obligations; provided, that the UNION shall hold the EMPLOYER harmless for demands under this Article not in accord with Federal, State and Local Law.

2 **Additional Employees:** When the EMPLOYER needs additional Employees, the EMPLOYER shall give the UNION equal opportunity with all sources to provide suitable applicants but shall not be required to hire those referred by the UNION.

## Article 3 - SUBCONTRACTING

1. The EMPLOYER agrees that it will not lease, assign, or subcontract any bargaining unit work to any person, partnership, corporation, or business enterprises until or unless all of the EMPLOYER's work force is engaged, and/or the EMPLOYER does not own the necessary equipment to perform said work.

2. The EMPLOYER shall use its best efforts to notify the UNION about its subcontractors who are Owner/Drivers under this Article regardless of whether or not the vehicle is licensed in the name of the driver or lessee. Upon request, the UNION shall use best efforts to provide the EMPLOYER with a list of subcontractors that the UNION believes to be in good standing (Approved Subcontractors). The EMPLOYER shall use its best efforts to engage the Approved Subcontractors before considering engaging the services of any non-signatory subcontractors.

3. In order to protect the wages, working conditions and job opportunities of workers employed under this Agreement, it is agreed that if the EMPLOYER subcontracts any work on any construction project covered by this Agreement (the "Sub- contracted

# EXHIBIT A

Project"), EMPLOYER shall pay such subcontractor wages at least equal to the wages and fringe benefits being paid to employees under this Agreement in performing such work for the duration of said Sub-Contracted Project.

4. Within 3 days of written proof from the UNION that the EMPLOYER'S subcontractor's driver is not being paid in compliance with the terms contained in this Article 3 (the "Non-Compliant Driver"), the EMPLOYER shall require its subcontractor to cease using such Non-Compliant Driver on all projects until such time that the violation is remedied. In the event that the UNION is unable to identify the name of the Non-Compliant Driver, the EMPLOYER will make demand of such information from the subcontractor. If it is found that, after such 3-day period of the UNION providing such written proof to the EMPLOYER, that the EMPLOYER has continued to utilize such subcontractor's Non-Compliant Driver on its projects and the subcontractor has failed to remedy all elements of non-compliance for the Non-Compliant Driver after said 3-day period, the EMPLOYER shall be responsible for the paying the difference between the amount of wages and fringe benefits paid by its subcontractor and the amounts which should have been paid under this Article beginning after the 3-day period. The fringe benefits shall be paid directly to the fringe benefit funds contained in this Agreement. Furthermore, the EMPLOYER shall reimburse the Union for all attorney fees and costs incurred for its failure to comply with this paragraph following such 3-day period.

## Article 4 - NO STRIKES OR LOCKOUTS

In view of the fact that parties have provided for an orderly procedure for settling differences of opinions and disputes, the UNION hereby agrees that for the duration of this Agreement, there shall be no strikes except as otherwise herein provided and the EMPLOYER agrees that during the life of this Agreement there shall be no lockouts.

## Article 5 - GRIEVANCES AND ARBITRATION

1. A grievance for the purpose of this Agreement is a complaint or claim against the EMPLOYER by an employee, employees, or the Union with respect to the meaning and/or application of the Provisions of this Agreement.

2. Any Grievance that may arise under the application of this Agreement shall be processed in the following manner:

Step 1: Verbal Notice To Supervisor

An Employee having a grievance shall promptly report their grievance to their immediate supervisor within seven (7) calendar days of the event believed to constitute the grievance. The supervisor shall investigate and render their decision in writing within seven (7) calendar days after the grievance is presented to them.

Step 2: Written Grievance

If the grievance is not resolved in Step 1 decision, the employee may, within seven (7) calendar days of notification of the Step 1 response, submit their grievance in writing to the Human Resources Manager of the EMPLOYER and the Union who shall then jointly review the grievance within seven (7) calendar days of the written notice or a date mutually agreed upon between the parties5 The written grievance shall state the facts

# EXHIBIT A

giving rise to the grievance, the Article(s) and Section(s) alleged to be violated and the resolution requested. The EMPLOYER shall provide a written answer within fifteen (15) calendar days after the date of the meeting between the Union and the Employer

Step 3: Written Appeal

If the grievance is not resolved at Step 2, the Union may, at its election, no later than seven (7) calendar days following receipt of the EMPLOYER's Step 2 response, refer the grievance to a non-binding mediation to be conducted through the Federal Mediation and Conciliation Service Grievance Mediation Program. Upon referral, notification to the EMPLOYER must be given. Neither the Union nor the EMPLOYER shall use the information discovered as a result of the mediation at arbitration, or for any other purpose. If the grievance is not resolved at Grievance Mediation, and either party wishes to arbitrate, the matter must be referred to arbitration and the alternate party notified, within thirty (30) calendar days of the last mediation session.

Step 4: Arbitration

The Union and EMPLOYER shall jointly request the Federal Mediation and Conciliation Service for a list of seven (7) arbitrators who are members of the National Academy of Arbitrators. From the list, the winner of a coin toss shall determine who shall strike the first name, and the parties shall strike alternately with each party striking three (3) names, and the person whose name remains shall be the Arbitrator.

The Arbitrator will be jointly contacted and asked to hold a hearing at which both parties may present evidence. The Arbitrators shall decide only the grievance submitted by applying the express language of this Agreement, and shall have no authority to add to, subtract from, modify, or amend this Agreement.

The Arbitrator's duly rendered decision shall be final and binding on the EMPLOYER, the Union, and the Employee(s) involved. The Arbitrator's fees and expenses shall be borne equally by the EMPLOYER and the Union involved.

The time limits set forth in this Article are of the essence of this Agreement. No grievance shall be accepted unless it is submitted within the time limits set forth in the section of this Agreement. If the grievance is not timely submitted in any of the steps outlined in this procedure, it shall be deemed waived and settled in accordance with the EMPLOYER's answer, and may not be resubmitted.

An Employee shall not be able to recover payment for an alleged violation of contract which occurred prior to thirty (30) days preceding the date of the filing of a grievance.

An Employee who fails to make complaints about wages or conditions until they are no longer employed except for grievances relating to their discharge, shall have no recourse under this Agreement.

Any grievance with respect to the discharge of an Employee shall be subject to processing under this Article the same as any other grievance, except that any grievance based on discharge must be presented within seven (7) calendar days after the occurrence of the discharge or the case will be considered as closed. The EMPLOYER shall not discharge or suspend any Employee without just cause.

In view of the fact that the parties have provided for an orderly procedure for settling grievances, the Union agrees that for the duration of this Agreement there shall be

# EXHIBIT A

no strikes and the EMPLOYER agrees that during the life of this Agreement there shall be no lockouts, except as provided in the paragraph directly below.

In the event the EMPLOYER violates the provisions of this Agreement relating to the rate of scale of wages, or the remittance of contributions under the Health and Welfare or Lumber Retirement Pension Plans, and thereafter refuses to correct or remedy the said violations within ten (10) days of receipt of written notice from the Union protesting the said violations, then the grievance procedure herein above set forth shall have no application to such circumstances, and the Union shall be permitted all legal and economic recourse, including the right to strike and picket until such violations are corrected, notwithstanding anything to the contrary contained in this Agreement.

### Article 6 – WAGES

1. The following rates of pay shall prevail during the period herein set forth. The following rates of pay shall apply to work covered under Article 1 Section 4 (d) Material Haul, of this Agreement, provided that the overall economic package meets at least the wages listed in this Article.

    For all other work covered under Article 1, Section 4(a) Heavy Construction (b) Highway Construction Work (c) Heavy Equipment Hauling and (e) Articulate End Dump Work, said work shall be compensated for all time spent to, from, and on the site at the total economic equivalence of the M.A.R.B.A. Agreement in effect at the time the work is performed, or this Labor Agreement, whichever is greater. Further, it is hereby agreed that when Employees covered by this Agreement are engaged in work within the Local Union's geographic jurisdiction or within the territorial jurisdiction of a neighboring Teamster Local Union, or performing work covered by a different job classification commanding a higher rate of pay than established by this contract, that all conditions of employment including wages, commissions, hours of work, shift differentials, working days and working hours, shall be maintained at not less than the highest minimum standards in effect for this category of work at the time the work is performed, on this type of contract within the adjoining Local Unions, this Local Union, the M.A.R.B.A. CBA, or pursuant to this Agreement, whichever is greater.

2. **WAGES:** The following rates of pay shall apply for work performed under this Agreement and for vacation and holiday pay. There shall be an increase in the total economic package according to the following schedule. Allocation of these amounts between wages and/or fringe benefits funds shall be determined by the UNION and provided to the EMPLOYER at least thirty (30) days prior to the effective date of the increase.

7

# EXHIBIT A

The straight time hourly wage scale for employees shall be as follows:

| Effective | Amount |
|-----------|--------|
| 6/1/2023 | $33.00 per hour |
| 6/1/2024 | $34.00 per hour |
| 6/1/2025 | $35.00 per hour |
| 6/1/2026 | $36.00 per hour |

EMPLOYER may pay Employee(s), who were working for EMPLOYER prior to and on the effective date of this Agreement, a rate of wages that is higher than the wages provided in this Article and such payment shall not entitle any other Employee to the payment of wages at such rate(s). Furthermore, such employees will be entitled to the scheduled increases each year for the duration of this Agreement.

Low-Boy and Articulating End-Dump Operations: Work performed under Article 1.4 (c) and (e) must be compensated at the applicable MARBA/Local 786 Area Construction Agreement wage rate of pay with overtime hours paid after eight (8) hours per day worked within the work class outlined in Article 1.4 (c) and (e)

3. The EMPLOYER agrees to compensate the Employees, the Prevailing Wage Rates when engaged in construction work covered by the Davis Bacon Act. Any and all work performed on any project having a predetermined wage setting or covered by a governmental wage requirement, such as the Illinois Prevailing Wage Act and/or the Davis Bacon Act, shall be paid at the rates outlined in the Area Construction Agreement (MARBA). Furthermore, EMPLOYER shall not pay wages for construction work that are below those contained in any Area Agreement within the jurisdiction of IBT Joint Council 25.

4. With respect to non-prevailing wage construction work, including but not limited to excavating, asphalt paving and grinding, the wage rates contained in the Area Construction Agreement shall apply to all work performed.

5. The EMPLOYER and Employee agree to notify the Union Representative when utilizing new types of equipment for work covered under this Agreement and not formerly used by the EMPLOYER, the Negotiating Committee of the EMPLOYER and the UNION shall meet to immediately negotiate the wage scale for same. The agreed rate shall be retroactive to the equipment's first day of utilization.

6. An hourly Employee's pay shall start at whatever time the Employee reports for work as instructed by the EMPLOYER and shall not stop until he/she ceases operation of the truck, including filling it with gasoline and oil if requested by the EMPLOYER.

7. The workweek shall begin on a Sunday and end on the following Saturday of each

# EXHIBIT A

week. All Employees shall be paid weekly and no later than the Friday following the immediately preceding workweek. Employee's paycheck shall be ready for him/her not later than quitting time on designated payday or via direct deposit if it is available.

8. For those Employees compensated on an hourly basis, the EMPLOYER shall list on each Employee's check stub the amount of straight time hours and the amount of overtime hours as well as all deductions from the Employee's payroll.

9. An Employee who was injured on the job, and is sent home, or to a hospital or who must obtain medical attention (a "compensable injury"), shall receive pay at the applicable hourly rate for the balance of his/her regular straight time shift on that day. An Employee who has returned to his/her regular duties after sustaining a compensable injury who is required by the EMPLOYER's doctor to receive additional medical treatment during his or her regularly scheduled working hours shall receive his/her regular hourly rate of pay as described above for the straight time hours lost from work.

10. **Prevailing Wage Rate:** The EMPLOYER agrees that on any State, Federal, or Municipal project requiring the payment of the prevailing area standard wage, the· EMPLOYER shall be bound to pay the State and or County Prevailing Rate for wages and fringe benefits and may rely upon the contract rates only if the total package regarding wages, welfare and Lumber Retirement Pension are greater than the prevailing rate for work of like nature performed in this local.

11. Whenever it has been determined under the terms of this Agreement that the EMPLOYER has failed to pay proper wages, the EMPLOYER will have seven (7) days from proper notice from the UNION to remedy its failure to pay such proper wages, otherwise the UNION reserves the right to strike the EMPLOYER until the proper amounts are paid.

### Article 7 - HEALTH AND WELFARE

1. **Commencing with June 1, 2023:** For each regular full time Employee covered by this Agreement who performs any work in such week, the EMPLOYER shall pay the applicable rate per week to the Teamsters Local 786 Health and Welfare Fund set up by the Trust Agreement now in effect. Payment into the Health and Welfare Fund shall also be made during periods of paid vacation. There shall be an increase in the total economic package according to the following schedule. Allocation of these amounts between wages and/or fringe benefits funds shall be determined by the UNION thirty (30) days prior to the effective date of the increase.

| Effective | Amount |
|-----------|--------|
| 6/1/2023 | $397.00 per week per employee |
| 6/1/2024 | $417.00 per week per employee |
| 6/1/2025 | $437.00 per week per employee |
| 6/1/2026 | $457.00 per week per employee |

It is agreed that the above distribution of the wages, Health and Welfare Fund and Lumber Retirement Pension Fund contributions may be modified by the UNION if

9



# EXHIBIT A

necessary, to maintain appropriate Health and Welfare Fund and Lumber Retirement Pension Fund coverage. Such notification of modifications shall be provided to the EMPLOYER at least thirty (30) days prior to the effective date of said increases.

a. The applicable Fund shall in all respects be administered in accordance with the Trust Agreement. The method and amount of payment shall be as follows:

   i. Employer shall contribute to the Local 786 Building Material, Chauffeurs, Teamsters and Helpers Welfare Fund of Chicago, which shall be jointly administered, by Employer Trustees and Union Trustees as provided in the Trust Agreement, the amount per week stated in Article 7 as of the appropriate date stated therein for each employee covered by this Agreement who performs work on any two calendar days in any calendar week, regardless of the number of hours worked, beginning with the first such week of employment. Payment shall be retroactive to the first day of employment for new employees provided they have completed their probationary period. Contributions shall also be made for the weeks of paid vacation, but not if the employee's vacation time occurs during a period of layoff, leave of absence or illness.

   ii. Payment shall be made on casual or emergency employees who are defined for this purpose only as employees who are not regularly scheduled employees and such payment shalt be made for the hours/weeks actually worked.

   iii. If any regular Employee is absent because of non-occupational illness or injury, the EMPLOYER shall continue to make the required weekly contribution or hourly contribution (at forty (40) hours per week) for a period of four (4) weeks.

   iv. If any regular Employee is absent because of occupational illness or injury, the EMPLOYER shall continue to make the required weekly contribution or hourly contribution (at forty (40) hours per week) until the Employee returns to work, or for a period of twelve (12) months, whichever is the shorter.

b. The obligation to make the above contributions shall continue during periods when the Collective Bargaining Agreement is being negotiated, except during a strike.

c. The EMPLOYER agrees that it is bound by and is a party to the Trust Agreement creating the Health and Welfare Fund and the Lumber Retirement Pension Fund, and all prior and subsequent Amendments thereto, as if it had signed the original copy of each of the said Trust Agreements, both of which said Agreements being incorporated herein by reference and made a part hereof; the EMPLOYER hereby designates as its Representatives on the Board of Trustees of said Funds such Trustees as are named in said Agreements and Declarations of Trust, as Employer Trustees, together with their successors selected in the manner provided in said Agreements and Declarations of Trust, as they may be amended from time to time; and further agrees to be bound by all action taken by said Employer Trustees regarding and pursuant to the said Agreements and Declarations of Trust as amended from time to time.

d. **Remedy for failure to pay or delinquent payment to the Teamsters Local 786 Health and Welfare Fund:** The EMRbOYER recognizes the necessity of making

# EXHIBIT A

prompt Health and Welfare Fund contributions in accordance with the terms of the Trust Agreement. The possibility that Employees' benefit standing will be placed in jeopardy if contributions are not made timely and the concern of the UNION that all eligible Employees are covered by such contributions.

Whenever the EMPLOYER is delinquent in making payments to the Teamsters Local 786 Health and Welfare Fund, as required under this Agreement or the rules and regulations of the respective Trust Agreement, then the UNION may strike the EMPLOYER to enforce such payment. This provision shall not be subject to and is specifically excluded from the Grievance Procedure contained herein. The EMPLOYER shall be responsible for any loss of any Health & Welfare benefits resulting thereby and reimbursement for all wages lost because of any action taken by the UNION as permitted under this Agreement and as a result of the EMPLOYER's delinquency. Additionally, in the event the EMPLOYER has been found to be delinquent under the terms of the Trust Agreement, the EMPLOYER shall be required to pay in addition to the actual delinquency, eighteen percent (18%) of the delinquent amount in liquidated damages, plus accountant and attorney fees and court costs.

e. A calendar week is Sunday through Saturday. The EMPLOYER and the UNION agree that the benefit fund contribution amounts set forth above are intended to cover the cost of benefits provided by the Welfare Fund, as well as the EMPLOYER portion of any payroll or other taxes that may become due as a result of the payment of benefits.

f. **Benefit calculation re-opener:** It is agreed between the parties, that if during the life of this Agreement the Teamsters Local 786 Health and Welfare Fund and/or Lumber Retirement Pension Fund(s), upon advice of their actuaries, change the method or formula or funding of contributions from the present weeks worked to hours worked, then upon seven (7) days written notice by the UNION to the EMPLOYER, the Welfare and/or Lumber Retirement Pension Fund Articles of this Agreement, and no others, shall be re-opened to negotiate an hourly benefit contribution in an amount determined by the actuary necessary to fund the plan(s) at its/their current level of benefits.

In the event of impasse, the levels of contributions based on weeks worked as set forth in this Agreement shall remain in force for the remaining life of this Agreement.

**Surety Bond:** If the EMPLOYER intentionally violates the wage or benefit contribution rates as provided by the terms of this Agreement, and the amount of wages or benefits past due (the "Past Due Wages & Benefits") is in excess of Five Thousand and 00/100 Dollars ($5,000.00), the EMPLOYER shall deposit with the office of the UNION or Trust, as applicable, a Surety Bond to guarantee the payment of such past due wages and benefits. The amount of the bond shall be 1.25 times the amount of past due wages and benefits and shall be issued for a period of one (1) year. Determination of the delinquency shall be made in accordance with the terms of this Agreement and/or Trust Agreement, as applicable. The UNION shall provide written notice to the EMPLOYER of any delinquency in wages or fringe benefit contributions as defined herein.

### Article 8 - L U M B E R  RETIREMENT PENSION FUND

1. Commencing with June 1, 2023, the EMPLOYER shall pay the applicable rate



# EXHIBIT A

per week per employee into Teamsters Local 786 Lumber Retirement Pension Fund for the purpose of providing Lumber Retirement Pension benefits to employees covered by this Agreement. There shall be an increase in the total economic package according to the following schedule. Allocation of these amounts between wages and/or fringe benefits funds shall be determined by the UNION thirty (30) days prior to the effective date of the increase. It is agreed that the above distribution of the wages, Health and Welfare Fund and Lumber Retirement Pension Fund contributions may be modified, if necessary, to maintain appropriate Health and Welfare and Lumber Retirement Pension coverage. Such notification of modifications shall be provided to the EMPLOYER at least thirty (30) days prior to the effective date of the increases.

| Effective | Amount |
|---|---|
| 6/1/2023 | $270.00 per week per employee |
| 6/1/2024 | $285.00 per week per employee |
| 6/1/2025 | $300.00 per week per employee |
| 6/1/2026 | $315.00 per week per employee |

a. **Lumber Retirement Pension rates are all inclusive of any Lumber Retirement Pension Protection Act charges.** The Teamsters Local 786 Lumber Retirement Pension Fund shall be administered by the Board of Trustees and in all respects in accordance with the Trust Agreement. The method and amount of payment shall be as follows:

    i. Employer shall contribute to the Local 786 Building Material, Chauffeurs, Teamsters and Helpers Lumber Retirement Pension Fund of Chicago, which shall be jointly administered, by Employer Trustees and Union Trustees as provided in the Trust Agreement, the amount per week stated in Article 8 as of the appropriate date stated therein for each employee covered by this Agreement who performs work on any two calendar days in any calendar week, regardless of the number of hours worked, beginning with the first such week of employment. Payment shall be retroactive to the first day of employment for new employees provided they have completed their probationary period. Contributions shall also be made for the weeks of paid vacation, but not if the employee's vacation time occurs during a period of layoff, leave of absence or illness.

    ii. If any regular Employee is absent because of occupational illness or injury, the required contribution shall be made until the Employee returns to work, or for a period of six (6) months, whichever is the shorter.

b. The obligation to make the above contributions shall continue during periods when the Collective Bargaining Agreement is being negotiated, except during a strike.

c. The EMPLOYER agrees that it is bound by and is a party to the Trust Agreement creating the Teamsters Local 786 Lumber Retirement Pension Fund, and all prior and subsequent amendments thereto, as if it had signed the original copy of the said Trust Agreement, said Agreement being incorporated herein by reference and

# EXHIBIT A

made a part hereof, the EMPLOYER hereby designates as its representatives on the Board of Trustees of said Fund such Trustees as are named in said Agreement and declaration of Trust, as Employer Trustees, together with their successors selected in the manner provided in said Agreement and declarations of Trust, as it may be amended from time to time; and further agrees to be bound by all action taken by said Employer Trustees regarding and pursuant to the said Agreement and declaration of Trust as amended from time to time, provided that the Employer does not waive but retains in full measure that same right to challenge on constitutional or legal grounds any assessment or withdrawal liability that it had upon the date of enactment of the Multi-Employer Lumber Retirement Pension Plan Amendments Act of 1980.

d. **Remedy for failure to pay or delinquent payment to the Lumber Retirement Pension Fund:** The EMPLOYER recognizes the necessity of making prompt Lumber Retirement Pension Fund contributions in accordance with the terms of the Trust Agreement, the possibility that Employees' benefit standing will be placed in jeopardy if contributions are not made timely, and the concern of the UNION that all eligible Employees are covered by such contributions.

Whenever the EMPLOYER is delinquent in making payments to the Lumber Retirement Pension Fund, as required under this Agreement or the rules and regulations of the respective Trust Agreement, then the UNION may strike the EMPLOYER to enforce such payment. This provision shall not be subject to and is specifically excluded from the Grievance Procedure. The EMPLOYER shall be responsible for any loss of any Lumber Retirement Pension benefits resulting thereby and reimbursement for all wages lost because of any action taken by the UNION as permitted under this Agreement and as a result of the EMPLOYER's delinquency. Additionally, in the event the EMPLOYER has been found to be delinquent under the terms of the Trust Agreement, the EMPLOYER shall be required to pay, in addition to the actual delinquency, eighteen percent (18%) of the delinquent amount as liquidated damages, and accountant and attorney fees and court costs.

**Surety Bond:** If the EMPLOYER is found to be in violation of the wage or benefit contribution rates as provided by the terms of this Agreement, and the amount of wages or benefits past due (the "Past Due Wages & Benefits") is in excess of Five Thousand and 00/100 Dollars ($5,000.00), the EMPLOYER shall deposit with the office of the UNION or Trust, as applicable, a surety bond to guarantee the payment of such Past Due Wages & Benefits. The amount of the bond shall be 1.25 times the amount of Past Due Wages & Benefits and shall be issued for a period of one (1) year. Determination of the delinquency shall be made in accordance with the terms of this Agreement and/or Trust Agreement, as applicable. The UNION shall provide written notice to the EMPLOYER of any delinquency in wages or fringe benefit contributions as defined herein.

### Article 9 - CHECK-OFF

1. Upon receipt of a written authorization from the Employee on a form provided by the UNION, the EMPLOYER agrees to deduct all voluntary Employee contributions provided under this Agreement, including but not limited to initiation fees and re-initiation fees and monthly union dues from the pay of each such Employee in the amount and manner prescribed by the UNION in accordance with its Constitution and By-Laws and shall remit same to the UNION within ten (10) days from its collection.

13



EXHIBIT A

All employees shall, as a condition of employment, be required to pay dues to the Union on a monthly basis on or before the last business day of the current month. The employee shall be obligated to pay the monthly dues to the Union, as well as any initiation or re-initiation fees or cost of transfer fees as required by the Local Union By-Laws or the International Brotherhood of Teamsters Constitution.

2. The UNION shall indemnify, defend and save the EMPLOYER harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reasons of action taken, or not taken, by the EMPLOYER for the purpose of complying with any provisions of this Article on reliance upon any lists, notices, or assignments furnished under this Article.

## Article 10- D.R.I.V.E. AUTHORIZATION AND DEDUCTION

Upon receipt of a written authorization from the Employee, the EMPLOYER agrees to deduct from the Employee's paycheck voluntary contributions to Democratic Republican Independent Voter Education (D.R.I.V.E.). D.R.I.V.E. shall notify the EMPLOYER of the amounts designated by each Employee that are to be deducted from his/her paycheck on a weekly basis for all weeks worked. The phrase "weeks worked" excludes any week other than a week in which the Employee earned a wage. The EMPLOYER shall transmit to D.R.I.V.E. National Headquarters on a monthly basis, no later than the end of the month following the month in which the voluntary D.R.I.V.E. contribution was deducted from the Employee's paycheck, in one (1) check, the total amount deducted along with the name of each Employee on whose behalf a deduction was made, the Employee's social security number, and the amount deducted from the Employee's paycheck. D.R.I.V.E. agrees to indemnify the EMPLOYER and hold it harmless against any and all suits, claims demands, and other liability for damages, penalties, or back payment that may arise out of, or resulting from the application of the provisions of this Article.

## Article 11-WORKING HOURS AND OVERTIME

It is expressly understood by and between the respective Bargaining Committees that Article 11.1, 11.2, 11.4 and 11.5 herein contained, apply only to Employees who are compensated based on the hourly wage schedule, pursuant to Article 6.2.

1. Eight (8) continuous hours (not including meal period referred to in Article 11.6 shall constitute a workday. Forty (40) straight time hours, Monday through Friday, shall constitute a work week, without regard to the weekly pay period as established by the EMPLOYER.

2.
   a. Time and one-half (1 ½) shall be paid for all time worked over forty-six (46) hours in any one week, Monday through Friday (and Saturday when an Employee works a Saturday as a make-up day as determined in this Article). Effective upon execution of this Agreement, if any Employee calls-off or voluntarily leaves work before the workday is concluded for any reason during the Monday through Friday workweek, then Saturday shall be paid as a non-premium make-up day. Otherwise, Saturday shall be paid at the applicable overtime rate of time and one-half (1 ½) for all hours worked.

   b. If (i) any Employee calls-off at his/her own initiative on a regular scheduled workdayduring the workweek, or (ii) if any Employee begins work, is prevented from working an eight (8) hour work day because EMPLOYER's customer cancels

# EXHIBIT A

work as a result of a force majeure, EMPLOYER has no other work for the Employee, and is put to work on Saturday as a make-up day, he/she shall be guaranteed four (4) continuous hours of work at his/her applicable straight- time hourly rate of pay for that day. For purposes of this Article, "force majeure" is defined as any reason beyond the reasonable control of EMPLOYER and without the fault or negligence of the EMPLOYER including, but not limited to, fire, flood, earthquake or like acts of God, wars, revolution, civil commotion, explosion, acts of public enemy, embargo, acts of the government in its sovereign capacity, and COVID-19 or any other pandemic.

3.
   a. The EMPLOYER recognizes the desire of the Employees to know as soon as possible whether or not work will be available the following day. Therefore every reasonable effort shall be made to give an Employee his/her starting time the night before, provided however, that the assignment of a starting time shall not be construed as a guarantee of show-up time if the Employee is notified prior to leaving his/her home in the morning not to report for work, nor shall this Article preclude the EMPLOYER from calling Employees not scheduled the night before to work in the morning when required by business conditions.

   b. The EMPLOYER not notifying the Employee at least two (2) hours prior to reporting time that there will be no work that day shall give him/her two (2) hours pay for reporting. If requested by the EMPLOYER, the Employee must stay on the job to qualify for the two (2) hour pay. All reporting time shall be paid at the applicable hourly rate for that day.

   c. Nothing in this Agreement shall require an EMPLOYER to transfer an Employee who is paid the two (2) hours show-up time to another location that day.

4. If any Employee is ordered to start work by the EMPLOYER, Monday through Saturday he/she shall not receive less than eight (8) hours straight time pay except for 11.2(b). If he/she starts work on Sunday and holidays he/she shall not receive less than four (4) hours' pay at the applicable hourly rate.

5. All work performed on any Sunday shall be paid at the rate of double time.

6. **Meal Period:** Each shift shall include an unpaid one-half(½) hour meal period. Employee who is required to work though their meal period and does work through their meal period shall be paid the straight-time hourly rate for such time worked.

7. **Safety Meeting:** Employees required to attend safety review meetings not scheduled as part of a regular workday shall be compensated at the applicable hourly rate of pay

8.   for all time spent attending such meetings.

### Article 12 - GENERAL CONDITIONS

1. **Seniority:**

   a. Seniority as the term is used herein, means the length of continuous service of any regular Employee from the date of first employment by the EMPLOYER as hereinafter provided.

   b. New Employees and Employees hired after a break in seniority shall be regarded as

15

# EXHIBIT A

probationary employees until they have acquired seniority rights. Probationary employees shall attain seniority rights when they have actually been at work in the employ of the EMPLOYER for a total of forty-five (45) work days or ninety (90) calendar days, whichever occurs first. The EMPLOYER may, within, said forty-five (45) days worked or ninety (90) calendar days, discharge such a probationary Employee for any reason whatsoever, except for membership in or lawful activity on behalf of the UNION. There shall be no responsibility for the re-employment of probationary employees if they are laid off or discharged prior to attaining seniority rights. After forty-five (45) work days or ninety (90) calendar days of employment as above defined, the names of such employees shall be placed on the seniority list as provided in Article 12.1(a) with a service credit reverting back to the first day of hire. The UNION shall receive a seniority list upon request.

c. The EMPLOYER shall keep posted in a conspicuous place, a master Seniority List or individual location seniority list (as may be appropriate) drafted in accordance with this Article.

d. Any Employee covered by this Agreement who accepts a promotion to a salaried position with the EMPLOYER shall retain all previously accumulated seniority for a period of twelve (12) consecutive months.

e. In case of layoff due to lack of work, Employees shall be laid-off in reverse order of seniority, providing the senior Employee is qualified to replace the laid-off Employee.

f. The re-hiring procedure shall be the reverse of the layoff procedure. When work increases, Employees laid-off shall be notified to report to work in order of seniority.

g. Failure by an Employee to return to work within three (3) days after notice or attempted notice, by U.S. Certified Mail to the Employee's last known address, a telephone call, and a copy being sent to the UNION office, will result in discharge and loss of Seniority Rights. The UNION office shall be notified by the EMPLOYER the same day as the Employee. The three (3) days do not begin until the UNION has been notified by the EMPLOYER. The UNION may furnish Temporary Drivers if requested to do so, until the laid-off Employee reports to work.

h. Seniority shall be broken by discharge for cause, voluntary quit, failure to report after three (3) working days as outlined in section 12.1(g) above or by a lay-off for nine(9) consecutive months.

i. Failure to report to work or call in to explain the reason for an Employee's absence for three (3) consecutive workdays shall be considered a voluntary resignation. All Employees domiciled at the same location will be assigned work according to their seniority, providing they are qualified. This will not affect the daily starting time. (All Employees reporting to the same job, doing the same work shall be started by seniority).

2. If the Employee is directed to take a truck to a jobsite or a garage and leave it at same, he/she shall be compensated until he/she returns to his/her original starting location.

## Article 13 - ADDITIONAL DUTIES

1. The EMPLOYER shall equip all trucks and tractors with workable heaters and

# EXHIBIT A

defrosters and, if equipped with air conditioning, the EMPLOYER will make every effort to keep same maintained and in working order. The EMPLOYEE shall make every effort to maintain the cleanliness of their assigned equipment and at all times ensure equipment cleanliness meets prescribed DOT standards. Damage resulting in EMPLOYER's loss of or damage to property by reason of the EMPLOYEE's gross misconduct, willful insubordination, or willful damage shall be the responsibility of the EMPLOYEE.

### Article 14-NON-DISCRIMINATION

1. The EMPLOYER and the UNION agree they will continue to not discriminate against any individual with respect to their hiring, compensation, terms and conditions of employment because of such individual's race, color, religion, sex, national origin, or age, (to the extent prohibited by law) nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of their race, color, religion, sex, national origin, or age and the Age Discrimination Employment Act of 1967, as amended (to the extent prohibited by law).

2. Where masculine or feminine terms are utilized throughout this Agreement, it is understood that each applies to the opposite sex.

### Article 15 – EMPLOYMENT TERMINATION

1. **No Discrimination:**

   a. There shall be no discrimination on the part of the EMPLOYER against any Employee, nor shall any Employee be discharged for any Union activity not interfering with the proper performance of their work.

   b. The EMPLOYER shall not discharge any Employee because of race, creed, national origin, or sex, or age; nor because the Employee has demanded wages, overtime, or other benefits to which this Agreement entitles them.

2. **Discharge or Suspension:** The EMPLOYER shall not discharge or suspend any Employee without just cause.

### Article 16 – HOLIDAYS

For Drivers that are paid hourly or on an hourly basis which qualifies for holiday pay as set forth in Article 6, there are six (6) paid holidays each calendar year:

1. New Year's Day
2. Memorial Day
3. Independence Day
4. Labor Day
5. Thanksgiving Day
6. Christmas Day

Eligible Employees shall receive holiday pay calculated at the rate applicable in Article 6 times eight (8) hours.

Double time shall be paid for all work performed on the following legal holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

17

# EXHIBIT A

To qualify for Holiday Pay as an eligible Employee, such Employee must have worked the scheduled workday immediately preceding the holiday and the scheduled workday immediately after the holiday.

If the holiday falls on Saturday or Sunday eligible Employees shall receive eight (8) hours at the applicable straight time hourly rate as set forth in Article 6, at the EMPLOYER's choosing, on either that Saturday or Sunday or on the immediately preceding or following workday.

## Article 17-VACATIONS AND LEAVES OF ABSENCE

**Vacations:** Employees who are eligible for vacation pay as set forth in Article 6 ("Eligible Employee(s)") and who have worked at least one hundred and forty (140) days, unless injured on the job or on worker's compensation, in the preceding calendar year for the EMPLOYER, shall be entitled to paid vacation at the straight time hourly rate applicable in Article 6 with the following schedule:

- One (1) week (or 40 hours) after one (1) year of employment

- Two (2) weeks (or 80 hours) after three (3) years of employment

- Three (3) weeks (or 120 hours) after ten (10) years of employment

- Four (4) weeks (or 160 hours) after fifteen (15) years of employment

All vacations must be scheduled by April 15th of each year, must be taken in no less than one (1) day or eight (8) hour increments and, in no event, shall such scheduled vacation request be submitted within thirty (30) days of the requested vacation time-off. All vacation time for a given calendar year must be fully used by the end of each calendar year in which the vacation time was awarded. Unless the EMPLOYER provides express written authorization, there will be no carry-over of unused paid vacation time from one calendar year to another.

**Leave of Absence:** Leaves of absence shall be granted to an Employee by mutual agreement between the EMPLOYER, the UNION and the Employee. Such leaves when granted shall be without pay and in writing, by the EMPLOYER and the Employee, each signing three (3) copies, one (1) copy of each shall be retained by the Employee, Employer, and the UNION.

All other time off must have EMPLOYER approval in advance, or otherwise will be considered a failure to report to work without a satisfactory reason under the Employee Handbook.

The EMPLOYER will not be responsible for contributions to the Health and Welfare Fund or Lumber Retirement Pension Fund during a Leave of Absence.

## Article 18 – OWNERS/DRIVERS

The EMPLOYER agrees that it will not subcontract work to any Owner/Operator or Owner/Driver unless there is full compliance with the subcontracting clause set forth in Article 3 so that all Owner/Operators or Owner/Drivers performing work must be paid an amount equal to the wages and fringe benefits being paid to Employees working under this Agreement.

18



# EXHIBIT A

## Article 19 – BULLETIN BOARD ACCESS

The EMPLOYER shall provide space on an EMPLOYER bulletin board for utilization of the UNION for posting notices falling within the following categories:

1. Union Meetings;
2. Union Appointments;
3. Union Elections;
4. Results of Union Elections;
5. International Union Correspondences and Required Postings.

Notices to be posted shall be signed by a Union Official. Any notices other than those specifically enumerated above shall be submitted to management for approval prior to posting. The bulletin board shall not be used by the UNION or its members for disseminating proposals, political materials, inflammatory materials, or materials derogatory to the EMPLOYER.

## Article 20 – JOB ACCESS BY UNION-STEWARDS

1. The Business Representative shall have the privilege to visit any job location to enforce the provisions of this Agreement.

2. The EMPLOYER recognizes the right of the UNION to designate Job Stewards. If requested by the UNION, the Steward shall have preference for overtime, Saturday, Sunday, and holiday work and shall be the last person laid-off at the conclusion of a project, provided he/she is qualified to perform the work. The authority of Job Stewards so designated by the UNION shall be limited to and shall not exceed, the following duties and activities:

   a. The transmission of such messages and information which shall originate with, and are authorized by the UNION, or its Officers, provided such messages and information:

      1. Have been reduced to writing; or

      2. If not reduced to writing, are of a routine nature and do not involve work stoppages, slow down, refusal to handle goods, are not incendiary or antagonistic toward EMPLOYER or in any other way interfere with the EMPLOYER's business.

   b. Job Stewards have no authority to take strike action or any other action interrupting the EMPLOYER's business.

   c. The EMPLOYER recognizes these limitations upon the authority of Job Stewards and shall not hold the UNION liable for any unauthorized acts by the Job Stewards.

      The EMPLOYER in so recognizing such limitations shall have the authority to impose discipline, including discharge, in the event the Steward has taken unauthorized strike action, slow down, work stoppage in violation of this Agreement or action in violation of this Article 22. Any action taken by the EMPLOYER shall not be subject to the Grievance and Arbitration Procedure.

3. A Job Steward shall be a competent working Teamster.

19

# EXHIBIT A

4. A Steward shall not leave the job during working hours unless authorized by the Employer.

### Article 21 – PROTECTION OF RIGHTS

It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action in the event an Employee refuses to enter upon any property involved in a sanctioned primary picket line, including the sanctioned primary picket line of Union's party to this Agreement, and including sanctioned primary picket lines at the EMPLOYER'S places of business. In the application of this Article, it is immaterial if the labor dispute or picketing is illegal if the labor dispute or picketing is sanctioned and or primary.

### Article 22 - SEPARATE AGREEMENTS

It is agreed that the EMPLOYER or the Employee and the UNION will not be asked to make any written or verbal Agreements, unless presented to the UNION by the EMPLOYER or the Employees and a vote taken by the Employees involved, to accept or reject said separate Agreement. Any approved verbal Agreement to be effective must be reduced to writing and signed by the parties.

### Article 23 – COMPLIANCE WITH SAFETY AND TRAFFIC LAWS

No Employee shall be responsible for the purchase or display of City or State license tags or plates. Overloading of trucks at the direction of EMPLOYER shall be the responsibility of the EMPLOYER. Overloading of trucks due to Employee's (A) failure to utilize a certified scale when available or (B) gross negligence shall be the responsibility of the Employee. Gross negligence is defined as a lack of care that demonstrates reckless disregard for the overweight loading of trucks, which is so great it appears to be a conscious violation of the load weight of the truck and trailer in violation of state law. Unless through the gross negligence of the Employee, if any Employee is arrested or is issued a summons because of faulty equipment, failure to display tags or licenses, overloading or overweight, he/she shall not be required to surrender his/her chauffeur's license in lieu of bond, and if he/she is thereby to appear in court on behalf of the EMPLOYER, he/she shall be reimbursed for his/her lost time at his/her regular straight time hourly rate of pay unless such actions are due to Employee gross negligence. In no event shall the EMPLOYER be responsible for the Employee's acts solely within the control of the Employee such as, but not limited to, Employee's violation of traffic laws. Where an Employee violates traffic laws, it shall be the responsibility to either post a bond or bond card, or to surrender his/her license.

### Article 24 – ECONOMIC LOSS

Employees covered by this Agreement receiving higher wages or more attractive working conditions than those provided for in this Agreement shall suffer no reduction by virtue of this Agreement and shall be paid the increase in wages herein negotiated. No Employee shall receive less than the negotiated hourly rates published within this Agreement.

### Article 25 – INSPECTION PRIVILEGES

1. Authorized Representatives of the UNION shall, have access to the EMPLOYER's establishment at all reasonable times for the purpose of adjusting disputes, investigating working conditions, collecting dues, and ascertaining compliance with

20

# EXHIBIT A

this agreement which shall include the right to inspect and audit those specific payroll records, time cards and sheets as may relate to a particular grievance or grievances alleging non-payment or improper payment of wages, Health and Welfare Fund or Lumber Retirement Pension Fund contributions. Such records shall be produced at a time and place mutually agreed upon and the EMPLOYER shall have the right to be present during the examination of said records.

2. The EMPLOYER shall keep a permanent payroll record for all Employees on an hourly, daily or weekly basis as applicable. Such records shall be preserved for a period of not less than three (3) years and shall be subject to examination by the UNION as provided under herein.

### Article 26 – EMERGENCIES

In case of emergencies such as floods, heavy snowfalls, fires or other disasters, the parties shall meet for the purpose of modifying Article 11 – Working Hours and Overtime to accommodate the needs of both the EMPLOYER and Employees.

It is understood and agreed that the above provision applies only in the event of emergencies and is not applicable where the job regularly demands more than one (1) shift.

### Article 27 – SALES AND TRANSFERS – SCOPE OF OBLIGATION

1. This Agreement shall be binding upon the parties hereto, and their respective successors, executors, assigns, and legal representatives; in the event the EMPLOYER's business or operation or part thereof, is sold, leased, transferred or taken over by any means whatsoever, including but not limited to sale, transfer, lease, succession, merger, consolidation, assignment, receivership, bankruptcy proceedings or operation of law, or taken over or absorbed by a parent company or a subsidiary company or subsidiary corporation, such business or operation shall continue to be subject to and covered by the terms and conditions of this Agreement for the life thereof. The EMPLOYER shall not use any leasing device to evade this Agreement. Nothing in this Agreement shall limit or restrict the right of an EMPLOYER to cease its business or operations.

2. In the event an employer buys out the business or operations of another employer and operates it as a separate legal entity, then the seniority of the employees of the acquired employer shall begin on the date of the acquisition.

3. In the event an employer buys out another employer covered by an Agreement with the UNION and merges operations of the bought-out employer into his own, the seniority of the Employees shall be established as follows:

   a. In the event the acquiring employer has bought-out or merged with another solvent employer who is covered by this Agreement, the seniority of the employees of both employers shall be merged within their seniority units in accordance with their dates of hire with their respective employers, to the extent of the acquiring employer's need as to qualifications and number of employees. This provision shall apply only as to merged operations within the same Local Union's jurisdiction.

   b. In the event the bought-out employer is insolvent, the employees of such employer who are retained shall be placed at the bottom of the seniority list as a group listed



# EXHIBIT A

in accordance with their previous seniority standing. The acquiring employer need retain such employees of the bought-out employer only to the extent of his/her need as to qualifications and number of employees.

## Article 28 – CONFORMITY TO LAW-SAVINGS CLAUSE

1. If any provision or the enforcement or performance of any provision of this Agreementis or shall at any time be contrary to law, then such provision shall not be applicable or enforced or performed, except to the extent permitted by law. If at any time thereafter such provision or its enforcement or performance shall no longer conflict with the law, then it shall be deemed restored in full force and effect as if it had never been in conflict with the law.

2. If any provision of this Agreement or the application of such provision to any person or circumstances shall be held invalid, the remainder of this Agreement or the application of such provision to other persons or circumstances, shall not be affected thereby.

3. If any provision of this Agreement or the application of such provision to any person or circumstances shall at any time be contrary to law, then the parties shall meet to negotiate a substitute provision which shall remain in effect until the expiration of this Agreement or until the affected provision is restored pursuant to Article 28.1 above. Should the parties' bargain to impasse over the substitute provision, either or both may impose economic sanctions in support of their position and neither the Grievance and Arbitration provisions of this Agreement nor the no strike-no lockout provisions shall be applicable.

## Article 29 - FUNERAL LEAVE

When an Employee's Spouse, Mother, Father, Sister, Brother, Wife, Mother-in-Law, Father-in- Law, Grandparents or Child dies, said Employee, if he/she so requests, shall be given the necessary time off with pay not to exceed a total of three (3) days. Such pay for time off shall be paid at the straight time hourly rate in effect at the unfortunate time of the loss for eight (8) hours per day.

## Article 30-MILITARY LEAVE OF ABSENCE

An Employee selected, drafted or who volunteers for military service for the United States of America, or for any governmental agency directly connected with the defense of the United States (or its allies) shall be granted a Military Leave of Absence, without pay, with accumulated seniority for the duration of such service and at the termination thereof shall be reinstated on the seniority list in his/her proper classification.

## Article 31 - UNIFORM DRUG/ALCOHOL ABUSE POLICIES

1. The UNION recognizes that the Employers of Teamsters are required to meet the regulations established by more than one governmental agency.

2.

A. It is hereby agreed that the EMPLOYER shall apply Policies under this Article consistent with the Construction Industry Service Corporation ("CISCO") "Uniform Drug/Alcohol Abuse Program". The only exception to this is that (1) the EMPLOYER is not required to return an Employee to work until such time as test results are available to the EMPLOYER and (2) the EMPLOYER shall not be responsible for the cost of testing procedures for applicants not yet employed by the EMPLOYER. Should State and

22

# EXHIBIT A

Federal Drug Free Workplace Acts, or other policies required to meet the regulations established by the Federal Department of Transportation or the Illinois Department of Transportation, conflict with the terms and conditions of the Area Wide Material Hauling Agreement, such State and Federal Policies shall prevail.

B.  It is further understood that Policies adopted by the EMPLOYER that are in excess of governmental regulations as referenced in this Article 31.2(a) shall be subject to the grievance procedure established in Article 5 of this Agreement.

3. All Employees shall be compensated for any and all time spent while complying with the drug and/or alcohol testing procedures as established within this Agreement. Said time shall be paid at the straight time hourly rate in effect that year per hour.

## Article 32 - UNIFORMS

The EMPLOYER shall pay the cost of all or any part of uniforms or wearing apparel constituting any part of a uniform that the EMPLOYER requires an Employee to wear. It is further agreed that the EMPLOYER will launder or clean said uniforms. Said provided apparel shall remain the property of the EMPLOYER. Costs associated with required safety work boots are the responsibility of the Employee.

## Article 33 - WORK RULES

The EMPLOYER may adopt reasonable safety and work rules not inconsistent with this Agreement or the law, and the UNION shall be given a written copy of such rules for review prior to issuance and circulation to the Bargaining Unit. Any discipline imposed for violation of said rule(s) shall be subject to review and/or challenge pursuant to the Grievance Procedure contained within this Agreement.

# EXHIBIT A

## Article 34- DURATION AND TERMINATION

This Agreement shall become effective on June 1, 2023, and shall remain in full force and effect until and including May 31, 2027, this Agreement shall be renewed automatically for periods of one (1) year unless either the EMPLOYER or the UNION provides written notice to the other of a desire to modify, amend or terminate at least sixty (60) days prior to the expiration of any such period.

This Agreement supersedes any and all prior Agreements that were entered into between the EMPLOYER and UNION.

**IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT EFFECTIVE ON THE DATE, MONTH AND YEAR FIRST WRITTEN ABOVE.**

*FOR THE UNION:*                                    *FOR THE EMPLOYER:*

CHAUFFEURS, TEAMSTERS AND                R WAY TRUCKING INC.
HELPERS LOCAL UNION NO. 786

_____                    _____
(Signature)                                                  (Signature)

Eddie Rizzo                                              Vince Kerr
_____                    _____
(Printed Name)                                          (Printed Name)

President                                                  oner
_____                    _____
(Title)                                                        (Title)

6/29/2023                                              6/27/23
_____                    _____
(Date)                                                       (Date)

24

# EXHIBIT A

May 1, 2024

R WAY TRUCKING
P.O. BOX 586
MORRIS, IL 60450

**BUILDING WELFARE & LUMBER PENSION**

Employer # 11196-11196

Dear Employer:

As you may know, well managed Welfare and Pension Funds conduct periodic inspections of pertinent employer records and contributions. These inspections not only verify the accuracy of contributions, but also furnish an opportunity to clear up any misunderstandings, which may exist in connection with the basis for the contributions.

Accordingly, the Trustees have initiated a program, on a spot check basis, to verify the correctness of payments made to the Funds by contributing employers. This decision is in accordance with the provision of the Trust Agreement of the Local 786 Building Material Welfare and Pension Funds.

The auditors of the fund, Legacy Professionals, LLP, will conduct this audit. When contacted by a representative of this firm, we would appreciate your cooperation in arranging for a mutually satisfactory time and place for examination of the following records covering, as a minimum, the period from: 1-1-21 THRU CURRENT.

1. Weekly Payroll Journals
2. Individual Earnings records on all employees
3. Quarterly Withholding Tax and F.I.C.A. Tax returns (Form 941) and (Form W-3)
4. State Unemployment Compensation Tax Reports
5. Employer copies of monthly contribution report to all Funds
6. All pertinent personnel file information
7. Cash disbursement records for the entire period

Because these audits are being done on an impartial basis, this letter should not be interpreted as an indication of any information to the effect that your contributions have not been properly made. Should you have any questions concerning this audit, do not hesitate to contact the Fund Office.

BOARD OF TRUSTEES

By: _____
    Jeffrey W. Hoff, Administrator

    JWH:rtp

Cc: Legacy Professionals, LLP

# EXHIBIT B



# TEAMSTERS LOCAL UNION 786 LUMBER EMPLOYEES

## RETIREMENT FUND

300 SOUTH ASHLAND AVENUE • Suite 500 • CHICAGO, ILLINOIS 60607
Telephone 312.666.1875 • Fax 312.666.2258

March 25, 2025

R-Way Trucking                              Regular & Certified Mail
P.O. Box 586
Morris, IL 60450

The Fund office has been informed by our Auditors, Legacy Professionals, that they have received additional information from you but you have failed to included the following records needed to complete the payroll audit.

- Check Register for January 1, 2021 to June 30, 2024
- 941 and SUTA Information for 1st and 2nd quarter 2024
- Payroll Needed
  - Payroll for January 1, 2024 to June 30, 2024
  - Pay Period 4/16/22 - 4/22/22
  - Pay Period 5/21/22 - 5/27/22
  - Pay Period 6/18/22 - 6/24/22
  - Pay Period 7/2/22 - 7/8/22
  - Pay Period 7/23/22 - 7/29/22
  - Pay Period 7/30/22 - 8/6/22
  - Pay Period 12/9/23 - 12/15/23
  - Pay Period 12/16/23 - 12/22/23
  - Pay Period 12/23/23 - 12/29/23

Please provide the following records within 14 business days or this matter will be turned over to our Legal Counsel.

Sincerely,

Jeffrey W. Hoff
Administrator

cc: Legacy Professionals, L.L.C.



# EXHIBIT C

# BURKE BURNS & PINELLI, LTD.

**ATTORNEYS AT LAW**
**THREE FIRST NATIONAL PLAZA**
**70 WEST MADISON STREET**
**SUITE 4300**
**CHICAGO, ILLINOIS 60602-4229**
TELEPHONE (312) 541-8600     FACSIMILE (312) 541-8603
www.bbp-chicago.com

EDWARD J. BURKE
MARY PATRICIA BURNS
VINCENT D. PINELLI
MARK S. JAMIL
CHRISTOPHER J. HALES
SARAH A. BOECKMAN

MARTIN T. BURNS
COLIN M. CHENOWETH
JACK T. GROCHOWSKI

Of Counsel
JOSIE M. GOUGH
MATTHEW R. LEWIN

April 11, 2025

**_Via Regular & Certified Mail_**
R-WAY TRUCKING
P.O. Box 586
Morris, Illinois 60450
Attention: Vincent D. Kern, Jr.

> **RE:** Non-Compliance with Payroll Audit
> On behalf of the Local 786 Building Health and Welfare and Lumber Retirement
> Pension Funds
> Our file Nos: 40020, 40022

Dear Mr. Kern:

This law firm represents the above-referenced Pension Funds. It has been brought to our attention that R WAY TRUCKING (the "Company") has failed to produce certain records that the Funds' Administrator requested the Company to produce to the auditor, Legacy Professionals LLP ("Legacy"). That initial request was made on May 1st, 2024. Since that time the Company has provided some, but not all, of the documents needed by Legacy to complete the audit. I have included a copy of the last letter from the Funds' Administrator dated March 25, 2025, in which he specifically identifies the Company's records that are needed by Legacy to complete the audit.

I know you had been communicating with James Rock from Legacy up until February 13, 2025, but he has not heard back from you since then, nor have you produced the missing records.

This is the final written request from the Funds seeking your compliance with the applicable provisions of the Trust Agreements governing the Funds. The Company's failure to produce the required records on or before April 25, 2025, to Legacy will be deemed a breach of those Trust Agreements. The Fund will have no choice but to file a lawsuit in federal court to obtain compliance with this audit request. Consistent with its rights under the Trust Agreements and applicable statutes, the Funds will seek all relief available to it including, but not limited to, attorneys' fees, litigation costs, and pre-judgment interest.

Sincerely,
**BURKE BURNS & PINELLI, LTD.**

Vincent D. Pinelli

EXHIBIT D

VDP (w/enclosure)
cc: Jeffrey W. Hoff, Administrator



# LEGACY
## PROFESSIONALS LLP
### CERTIFIED PUBLIC ACCOUNTANTS

Board of Trustees
Building Material Chauffeurs, Teamsters and
Helpers Welfare & Pension Funds of Chicago
300 South Ashland Avenue
Chicago, Illinois 60607

Re:    R Way Trucking
       Reporting Period: January 1, 2021 to September 30, 2025

We were engaged by the Board(s) of Trustees of the Building Material Chauffeurs, Teamsters and Helpers Welfare & Pension Funds of Chicago (the Funds) to assist you in determining whether contributions to the Funds were made in accordance with the Collective Bargaining and Trust Agreements during the above referenced reporting period.

The management of R Way Trucking is responsible for making contributions in accordance with the requirements of the Collective Bargaining and Trust Agreements.

This engagement was performed in accordance with Statements on Standards for Consulting Services issued by the American Institute of Certified Public Accountants.  We were not engaged to, and did not, conduct an audit, the objective of which would be the expression of an opinion. Accordingly, we do not express such an opinion.  Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

Our findings are included in the attached schedules.

This report is intended solely for the information and use of the Trustees and Administrator of the Building Material Chauffeurs, Teamsters and Helpers Welfare & Pension Funds of Chicago and is not intended to be and should not be used by anyone other than these specified parties.

*Legacy Professionals LLP*

Westchester, Illinois

March 20, 2026

# EXHIBIT E

**LEGACY PROFESSIONALS, LLP**
**COMPLIANCE AUDIT INFORMATION SHEET**

| | | | |
|---|---|---|---|
| EMPLOYER NAME | R Way Trucking | EMPLOYER # | 11196 |
| ADDRESS | P.O. Box 586 | PHONE # | (815) 693-7155 |
| CITY/STATE/ZIP | Morris, IL 60450 | FEIN # | 20-8836895 |
| DATE OF CONTACT | August 26, 2024 | AUDIT PERIOD | January 1, 2021 to September 30, 2025 |
| CONTACT'S NAME | Vince Kern | TITLE | Owner |
| PERSON FUND IS TO CONTACT | SAME AS ABOVE | TITLE | SAME AS ABOVE |
| ENTITY TYPE | CORPORATION | | |

DOES EMPLOYER HAVE INTEREST IN OTHER OPERATIONS ?      ☐ YES      ☑ NO

IF YES, LIST NAME OF SAME

AUDIT DATE      September 18, 2026

AUDIT SITE (IF DIFFERENT FROM EMPLOYER'S ADDRESS):

Legacy Professionals LLP

4 Westbrook Corporate Center, Suite 700

Westchester, IL 60154

ALL REQUIRED ACCOUNTING RECORDS WERE AVAILABLE WITH THE EXCEPTION OF:

No timecards available. Employer had not filed 1120 for 2023 - 2025.  W2's for 2021, W3 for 2023.

# EXHIBIT E

BRIEFLY DESCRIBE THE NATURE OF THE DELINQUENCY, IF ANY:     We discovered numerous instances where work was being performed without contributions. We discovered this via payroll in some instances. In other instances this was found via fuel expenses from the transaction detail by account. Weeks were assessed based upon fuel payments by truck numbers viewed in a given week (utilizing Saturday as a week-ending day). Instances of individuals being paid for trucking work off of payroll. Clerical errors also found in reporting.

DID YOUR EXAMINATION UNCOVER ANYTHING SPECIAL OR UNUSUAL WHICH SHOULD BE BROUGHT TO THE ATTENTION OF THE FUND COUNSEL OR OTHER INTERESTED PERSONS?     ☑ YES     ☐ NO

IF YES, EXPLAIN:     We found multiple periods with no payroll that contained fuel expenses assigned to truck numbers, as well as containing trucking income deposits. We totaled the days with fuel expenses per week based on Saturday period ending dates. If two or more fuel expenses were assigned to a truck number in a given week, a week worked was assessed. If the dollar amount of fuel expenses for a single truck was excessive with only 1 day of fuel expenses, a week worked was assessed. Following additional information from Jeff Hoff we were able to assign truck numbers to specific individuals. There were still fuel expenses viewed that did not have an assigned truck number. Some of those were labeled P/U which we assumed to be pick-up truck and ignored. Unassigned fuel expenses otherwise were totaled per week and a week worked was assessed if 2 or more days contained expenses. We found payments to a Tyler Enterprises and Tyler Leadinghouse in the transaction detail. These show as being Lease-Hold Improvements for insulation in walls. Upon further research we found Tyler Leadinghouse to be a principal of a trucking company in Morris, IL named Tyler's Transportation. Upon consideration of this and the amounts/number of payments we believe the Tyler Enterprises payments are likely linked to Tyler Leadinghouse. We also assume that each check is for a two week period due to the time between checks and the amounts.

AUDITOR:     James Rock

# EXHIBIT E



# LEGACY
## PROFESSIONALS LLP
### CERTIFIED PUBLIC ACCOUNTANTS

March 20, 2026

Building Material Chauffeurs, Teamsters and
  Helpers Welfare Fund of Chicago and
Local Union 786 Building Material Pension Fund
300 South Ashland Avenue
Chicago, Illinois 60607

**COMPLIANCE AUDIT REPORT**

Employer Name    R Way Trucking

Employer No.    11196

Address    P.O. Box 586
    Morris, IL 60450

Audit Date    September 18, 2026

Period Examined    January 1, 2021 to September 30, 2025

Employer representative, if any, present at the time of the compliance audit:

| Vince Kern | Owner |
|---|---|
| Name | Title |

Audit Location    1008 Harmony Ave
    Mazon, IL 60444

Summary of reason for under reported or over reported contributions

Indication of work being performed that was not reported
to the Funds.

$ 67,888.74    Is due to ( from ) the Building Material Welfare Fund

$   -    Is due to ( from ) the Building Material Pension Fund

James Rock
Compliance Auditor(s)

# EXHIBIT E

**COMPLIANCE AUDIT SUMMARY**

Board of Trustees
  Building Material Chauffeurs, Teamsters and
  Helpers Welfare & Pension Funds of Chicago
300 South Ashland Avenue
Chicago, IL 60607

Compliance Audit Of      R Way Trucking

Period Covered           January 1, 2021 to September 30, 2025

|  | Health & Welfare | |
|---|---|---|
| 2021 | 754.00 | |
| 2022 | 5,278.00 | |
| 2023 | 11,513.00 | |
| 2024 | 16,023.00 | |
| 2025 | 25,820.00 | |
| Total discrepancies: | 59,388.00 | |

| | | |
|---|---|---|
| Prior Overpayment: | (2,693.00) | |
| Prior Shortage: | 30.00 | |
| Prior Interest | 1,361.01 | |
| Compliance Audit Fee: | 9,802.73 | |

| | | |
|---|---|---|
| Total Amount due : | 67,888.74 | 0.00 |

# EXHIBIT E

# Local 786 Building Materials

Welfare & Pension Funds

Schedule of Discrepancies & (Credits) for  2021

Employer Name : R Way Trucking

Employer # :  11196

Address :  P.O. Box 586
Morris, IL 60450
Contact :  Vince Kern
Telephone # :  (815) 693-7155

Compliance Audit Period :
January 1, 2021 to September 30, 2025

Date of Audit :  September 18, 2026

James Rock
Compliance Auditor(s)

| Soc. Sec # | Employee | Date Hired | Date Term | Fund | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | EHRMAN, PAUL W | | | Welfare | | | | | | | | | | | | 1 | 1 |
| | | | | Pension | | | | | | | | | | | | | |
| 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 | KERN, VINCE D | | | Welfare | | | | | | | | | | | | 1 | 1 |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | Total Welfare | | | | | | | | | | | | | | 2 | 2 |
| | | Total Pension | | | | | | | | | | | | | | | |

2021

| | Date Hired | Date Term | | | | | | | | | | | | | | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 06/01/20 | 06/01/21 | | | | | | | | | | | | | | | Total |
| Welfare | 361.00 | 377.00 | | | | | | | | | | | | | | 754.00 | 754.00 |
| Pension | | | | | | | | | | | | | | | | | |
| | | Total | | | | | | | | | | | | | | 754.00 | 754.00 |

# Local 786 Building Materials

Welfare & Pension Funds

Schedule of Discrepancies & (Credits) for

2022

Employer Name :  R Way Trucking

Employer # :  11196

Address :  P.O. Box 586
Morris, IL 60450
Contact :  Vince Kern
Telephone # :  (815) 693-7155

Compliance Audit Period :
January 1, 2021 to September 30, 2025

Date of Audit :  September 18, 2026

James Rock
Compliance Auditor(s)

| Soc. Sec # | Employee | Date Hired | Date Term | Fund | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | JOHNSON, BENNY | | | Welfare | | | | 3 | 3 | 3 | 1 | | | | | | 10 |
| | | | | Pension | | | | | | | | | | | | | |
| 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 | PREUSS, KEVIN | | | Welfare | | | | | | 3 | 1 | | | | | | 4 |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | Total Welfare | | | | | 3 | 3 | 6 | 2 | | | | | | 14 |
| | | | Total Pension | | | | | | | | | | | | | | |
| | 2022 | | | | | | | | | | | | | | | | |
| | | 06/01/21 | 08/01/22 | | | | | | | | | | | | | | Total |
| Welfare | | 377.00 | 397.00 | | | | | 1,131.00 | 1,131.00 | 2,262.00 | 754.00 | | | | | | 5,278.00 |
| Pension | | | | | | | | | | | | | | | | | |
| | | | Total | | | | | 1,131.00 | 1,131.00 | 2,262.00 | 754.00 | | | | | | 5,278.00 |

# Local 786 Building Materials

Welfare & Pension Funds

Schedule of Discrepancies & (Credits) for                2023

Employer Name :        R Way Trucking

Employer # :        11196

Compliance Audit Period :
January 1, 2021 to September 30, 2025

Address :        P.O. Box 586
Morris, IL 60450

Date of Audit :        September 18, 2026

Contact :        Vince Kern

James Rock

Telephone # :        (815) 693-7155

Compliance Auditor(s)

| Soc. Sec # | Employee | Date Hired | Date Term | Fund | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | KERN, VINCE D | | | Welfare | | | | | 4 | | | | | | | 2 | 6 |
| | | | | Pension | | | | | | | | | | | | | |
| 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 | LEADINGHOUSE, TYLER | | | Welfare | | | | 2 | | | | | 2 | 4 | 4 | 4 | 16 |
| | | | | Pension | | | | | | | | | | | | | |
| 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 | PREUSS, KEVIN | | | Welfare | 3 | | | | | | | | | | | | 3 |
| | | | | Pension | | | | | | | | | | | | | |
| 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 | SPARENBERG, ROSS W | | | Welfare | | | | | 3 | | | | | | | 1 | 4 |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | Total Welfare | | 3 | | | 2 | 7 | | | | 2 | 4 | 4 | 7 | 29 |
| | | | Total Pension | | | | | | | | | | | | | | |

| 2023 | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 08/01/22 | | | | | | | | | | | | | | | | Total |
| Welfare | 397.00 | | | | 1,191.00 | | | 794.00 | 2,779.00 | | | | 794.00 | 1,588.00 | 1,588.00 | 2,779.00 | 11,513.00 |
| Pension | | | | | | | | | | | | | | | | | |
| | | | Total | | 1,191.00 | | | 794.00 | 2,779.00 | | | | 794.00 | 1,588.00 | 1,588.00 | 2,779.00 | 11,513.00 |

# Local 786 Building Materials

Welfare & Pension Funds

Schedule of Discrepancies & (Credits) for                                                          2024

Employer Name :    R Way Trucking

Employer # :    11196

Address :    P.O. Box 586
             Morris, IL 60450
Contact :    Vince Kern
Telephone # :    (815) 693-7155

Compliance Audit Period :
January 1, 2021 to September 30, 2025

Date of Audit :       September 18, 2026

James Rock
Compliance Auditor(s)

| Soc. Sec # | Employee | Date Hired | Date Term | Fund | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | KERN, VINCE D | | | Welfare | 1 | 2 | 2 | 1 | 1 | | 1 | 4 | 2 | 3 | 3 | 1 | 21 |
| | | | | Pension | | | | | | | | | | | | | |
| 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 | LEADINGHOUSE, TYLER | | | Welfare | 2 | | 1 | | | | | | | | 1 | | 4 |
| | | | | Pension | | | | | | | | | | | | | |
| 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 | PREUSS, KEVIN | | | Welfare | | 1 | | 1 | | 1 | | 1 | 1 | 2 | 3 | | 10 |
| | | | | Pension | | | | | | | | | | | | | |
| 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 | UNASSIGNED DRIVER | | | Welfare | | | | | | 1 | | 1 | | | | 2 | 4 |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | Total Welfare | | 3 | 3 | 3 | 2 | 1 | 2 | 1 | 6 | 3 | 5 | 7 | 3 | 39 |
| | | | Total Pension | | | | | | | | | | | | | | |

| | | 2024 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 08/01/22 | 06/01/24 | | | | | | | | | | | | | | Total |
| Welfare | | 397.00 | 417.00 | | 1,191.00 | 1,191.00 | 1,191.00 | 794.00 | 397.00 | 834.00 | 417.00 | 2,502.00 | 1,251.00 | 2,085.00 | 2,919.00 | 1,251.00 | 16,023.00 |
| Pension | | | | | | | | | | | | | | | | | |
| | | | Total | | 1,191.00 | 1,191.00 | 1,191.00 | 794.00 | 397.00 | 834.00 | 417.00 | 2,502.00 | 1,251.00 | 2,085.00 | 2,919.00 | 1,251.00 | 16,023.00 |

# Local 786 Building Materials

Welfare & Pension Funds

Schedule of Discrepancies & (Credits) for                                        2025

Employer Name : R Way Trucking

Employer # :    11196

Address :       P.O. Box 586
                Morris, IL 60450
Contact :       Vince Kern
Telephone # :   (815) 693-7155

Compliance Audit Period :
January 1, 2021 to September 30, 2025

Date of Audit :       September 18, 2026

James Rock
Compliance Auditor(s)

| Soc. Sec # | Employee | Date Hired | Date Term | Fund | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | KERN, VINCE D | | | Welfare | 1 | 2 | 1 | 1 | 5 | 4 | 4 | 5 | 4 | | | | 27 |
| | | | | Pension | | | | | | | | | | | | | |
| 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 | PREUSS, KEVIN | | | Welfare | | | | | 5 | 4 | 4 | 5 | 4 | | | | 22 |
| | | | | Pension | | | | | | | | | | | | | |
| 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 | UNASSIGNED DRIVER | | | Welfare | 1 | | | | 4 | 3 | 1 | 2 | | | | | 11 |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | | Welfare | | | | | | | | | | | | | |
| | | | | Pension | | | | | | | | | | | | | |
| | | | Total Welfare | | 2 | 2 | 1 | 1 | 14 | 11 | 9 | 12 | 8 | | | | 60 |
| | | | Total Pension | | | | | | | | | | | | | | |

| | 2025 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 06/01/24 | 06/01/25 | | | | | | | | | | | | | | Total |
| Welfare | 417.00 | 437.00 | | | 834.00 | 834.00 | 417.00 | 417.00 | 5,838.00 | 4,807.00 | 3,933.00 | 5,244.00 | 3,496.00 | | | | 25,820.00 |
| Pension | | | | | | | | | | | | | | | | | |
| | | Total | | 834.00 | 834.00 | 417.00 | 417.00 | 5,838.00 | 4,807.00 | 3,933.00 | 5,244.00 | 3,496.00 | | | | 25,820.00 |



# LEGACY
## PROFESSIONALS LLP
### CERTIFIED PUBLIC ACCOUNTANTS

Board of Trustees
Lumber Employees Local 786 Health and Welfare
and Retirement Funds
300 South Ashland Avenue
Chicago, Illinois 60607

Re:    R Way Trucking
       Reporting Period: January 1, 2021 to September 30, 2025

We were engaged by the Board(s) of Trustees of the Lumber Employees Local 786 Health and Welfare and Retirement Funds (the Funds) to assist you in determining whether contributions to the Funds were made in accordance with the Collective Bargaining and Trust Agreements during the above referenced reporting period.

The management of R Way Trucking is responsible for making contributions in accordance with the requirements of the Collective Bargaining and Trust Agreements.

This engagement was performed in accordance with Statements on Standards for Consulting Services issued by the American Institute of Certified Public Accountants. We were not engaged to, and did not, conduct an audit, the objective of which would be the expression of an opinion. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

Our findings are included in the attached schedules.

This report is intended solely for the information and use of the Trustees and Administrator of the Lumber Employees Local 786 Health and Welfare and Retirement Funds and is not intended to be and should not be used by anyone other than these specified parties.

*Legacy Professionals LLP*

Westchester, Illinois

March 20, 2026

# EXHIBIT F



**LEGACY PROFESSIONALS, LLP**
**COMPLIANCE AUDIT INFORMATION SHEET**

| | | | |
|---|---|---|---|
| EMPLOYER NAME | R Way Trucking | EMPLOYER # | 11196 |
| ADDRESS | P.O. Box 586 | PHONE # | (815) 693-7155 |
| CITY/STATE/ZIP | Morris, IL 60450 | FEIN # | 20-8836895 |
| DATE OF CONTACT | August 26, 2024 | AUDIT PERIOD | January 1, 2021 to September 30, 2025 |
| CONTACT'S NAME | Vince Kern | TITLE | Owner |
| PERSON FUND IS TO CONTACT | SAME AS ABOVE | TITLE | SAME AS ABOVE |
| ENTITY TYPE | CORPORATION | | |

DOES EMPLOYER HAVE INTEREST IN OTHER OPERATIONS ?   ☐ YES   ☑ NO

IF YES, LIST NAME OF SAME

AUDIT DATE          September 18, 2026

AUDIT SITE (IF DIFFERENT FROM EMPLOYER'S ADDRESS):

Legacy Professionals LLP

4 Westbrook Corporate Center, Suite 700

Westchester, IL 60154

ALL REQUIRED ACCOUNTING RECORDS WERE AVAILABLE WITH THE EXCEPTION OF:

No timecards available. Employer had not filed 1120 for 2023 - 2025.  W2's for 2021, W3 for 2023.

# EXHIBIT F

BRIEFLY DESCRIBE THE NATURE OF THE DELINQUENCY, IF ANY:     We discovered numerous instances where work was being performed without contributions. We discovered this via payroll in some instances. In other instances this was found via fuel expenses from the transaction detail by account. Weeks were assessed based upon fuel payments by truck numbers viewed in a given week (utilizing Saturday as a week-ending day). Instances of individuals being paid for trucking work off of payroll. Clerical errors also found in reporting.

DID YOUR EXAMINATION UNCOVER ANYTHING SPECIAL OR UNUSUAL WHICH SHOULD BE BROUGHT TO THE ATTENTION OF THE FUND COUNSEL OR OTHER INTERESTED PERSONS?     ☑ YES     ☐ NO

IF YES, EXPLAIN:     We found multiple periods with no payroll that contained fuel expenses assigned to truck numbers, as well as containing trucking income deposits. We totaled the days with fuel expenses per week based on Saturday period ending dates. If two or more fuel expenses were assigned to a truck number in a given week, a week worked was assessed. If the dollar amount of fuel expenses for a single truck was excessive with only 1 day of fuel expenses, a week worked was assessed. Following additional information from Jeff Hoff we were able to assign truck numbers to specific individuals. There were still fuel expenses viewed that did not have an assigned truck number. Some of those were labeled P/U which we assumed to be pick-up truck and ignored. Unassigned fuel expenses otherwise were totaled per week and a week worked was assessed if 2 or more days contained expenses. We found payments to a Tyler Enterprises and Tyler Leadinghouse in the transaction detail. These show as being Lease-Hold Improvements for insulation in walls. Upon further research we found Tyler Leadinghouse to be a principal of a trucking company in Morris, IL named Tyler's Transportation. Upon consideration of this and the amounts/number of payments we believe the Tyler Enterprises payments are likely linked to Tyler Leadinghouse. We also assume that each check is for a two week period due to the time between checks and the amounts.

AUDITOR:     James Rock

# EXHIBIT F



**LEGACY**

PROFESSIONALS LLP

CERTIFIED PUBLIC ACCOUNTANTS

March 20, 2026

Lumber Employees Local 786
   Health & Welfare & Retirement Funds
Local Union 786 Building Material Pension Fund
300 South Ashland Avenue
Chicago, Illinois 60607

**COMPLIANCE AUDIT REPORT**

Employer Name          R Way Trucking

Employer No.           11196

Address                P.O. Box 586
                       Morris, IL 60450

Compliance Audit Date  March 20, 2026

Period Examined        January 1, 2021 to September 30, 2025

Employer representative, if any, present at the time of the compliance audit:

| Vince Kern | Owner |
|---|---|
| Name | Title |

Audit Location         1008 Harmony Ave
                       Mazon, IL 60444

Summary of reason for under reported or over reported contributions

Indication of work being performed that was not reported to the Funds.

$ 48,778.08   Is due to ( from ) the Retirement Fund

James Rock
Compliance Auditor(s)

# EXHIBIT F

**COMPLIANCE AUDIT SUMMARY**

Lumber Employees Local 786
  Health & Welfare & Retirement Funds
Local Union 786 Building Material Pension Fund
300 South Ashland Avenue
Chicago, Illinois 60607

Compliance Audit Of     R Way Trucking

Period Covered     January 1, 2021 to September 30, 2025

|  | Pension |
|---|---|
| 2021 | 520.00 |
| 2022 | 2,080.00 |
| 2023 | 7,830.00 |
| 2024 | 10,935.00 |
| 2025 | 17,700.00 |
| Total discrepancies: | 39,065.00 |

| | |
|---|---|
| Prior Overpayment: | (1,021.00) |
| Prior Interest: | 896.07 |
| Compliance Audit Fee: | 9,838.01 |

| | |
|---|---|
| Total Amount due : | $ 48,778.08 |

# EXHIBIT F

# Lumber Employees Local 786 Benefit Funds

Retirement Fund

Schedule of Discrepancies & (Credits) for                                        2021

Employer Name : R Way Trucking                                                              Compliance Audit Period :
                                                                                                                  January 1, 2021 to September 30, 2025

Employer # :      11196

Address :        P.O. Box 586                            Date of Audit :       September 18, 2026
                 Morris, IL 60450
Contact :        Vince Kern                                                                                James Rock
Telephone # :    (815) 693-7155                                                                            Compliance Auditor(s)

| Soc. Sec # | Employee | Date Hired | Date Term | Fund | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | EHRMAN, PAUL W | | | Retirement | | | | | | | | | | | | 1 | 1 |
| 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 | KERN, VINCE D | | | Retirement | | | | | | | | | | | | 1 | 1 |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | Total Retirement | | | | | | | | | | | | | 2 | 2 |
| | 2021 | | | | | | | | | | | | | | | | |
| | 6/1/17 | | | | | | | | | | | | | | | | Total |
| Retirement | 260.00 | | | | | | | | | | | | | | | 520.00 | 520.00 |
| | | | Total | | | | | | | | | | | | | 520.00 | 520.00 |

# Lumber Employees Local 786 Benefit Funds

Retirement Fund

Schedule of Discrepancies & (Credits) for 2022

Employer Name : R Way Trucking

Employer # : 11196

Address : P.O. Box 586
Morris, IL 60450
Contact : Vince Kern
Telephone # : (815) 693-7155

Compliance Audit Period :
January 1, 2021 to September 30, 2025

Date of Audit : September 18, 2026

James Rock
Compliance Auditor(s)

| Soc. Sec # | Employee | Date Hired | Date Term | Fund | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | JOHNSON, BENNY | | | Retirement | | | | 3 | 3 | | 1 | | | | | | 7 |
| 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 | PREUSS, KEVIN | | | Retirement | | | | | | | 1 | | | | | | 1 |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | Total Retirement | | | | | 3 | 3 | | 2 | | | | | | 8 |
| | 2022 | | | | | | | | | | | | | | | | |
| | | 6/1/17 | 8/1/22 | | | | | | | | | | | | | | Total |
| Retirement | 260.00 | 270.00 | | | | | | 780.00 | 780.00 | | 520.00 | | | | | | 2,080.00 |
| | | | Total | | | | | 780.00 | 780.00 | | 520.00 | | | | | | 2,080.00 |

# Lumber Employees Local 786 Benefit Funds

Retirement Fund

Schedule of Discrepancies & (Credits) for                    2023

Employer Name :  R Way Trucking

Employer # :     11196

Compliance Audit Period :
January 1, 2021 to September 30, 2025

Address :        P.O. Box 586
                 Morris, IL 60450

Date of Audit :      September 18, 2026

Contact :        Vince Kern
Telephone # :    (815) 693-7155

James Rock
Compliance Auditor(s)

| Soc. Sec # | Employee | Date Hired | Date Term | Fund | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | KERN, VINCE D | | | Retirement | | | | | 4 | | | | | | | 2 | 6 |
| 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 | LEADINGHOUSE, TYLER | | | Retirement | | | | 2 | | | | | 2 | 4 | 4 | 4 | 16 |
| 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 | PREUSS, KEVIN | | | Retirement | 3 | | | | | | | | | | | | 3 |
| 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 | SPARENBERG, ROSS W | | | Retirement | | | | | 3 | | | | | | | 1 | 4 |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | Total Retirement | | 3 | | | 2 | 7 | | | | 2 | 4 | 4 | 7 | 29 |
| | 2023 | | | | | | | | | | | | | | | | |
| | | 8/1/22 | 6/1/23 | | | | | | | | | | | | | | Total |
| Retirement | 270.00 | 270.00 | | | 810.00 | | | 540.00 | 1,890.00 | | | | 540.00 | 1,080.00 | 1,080.00 | 1,890.00 | 7,830.00 |
| | | | Total | | 810.00 | | | 540.00 | 1,890.00 | | | | 540.00 | 1,080.00 | 1,080.00 | 1,890.00 | 7,830.00 |

# Lumber Employees Local 786 Benefit Funds

Retirement Fund

Schedule of Discrepancies & (Credits) for                    2024

Employer Name : R Way Trucking

Employer # :    11196

Address :    P.O. Box 586
Morris, IL 60450
Contact :    Vince Kern
Telephone # :    (815) 693-7155

Compliance Audit Period :
January 1, 2021 to September 30, 2025

Date of Audit :    September 18, 2026

James Rock
Compliance Auditor(s)

| Soc. Sec # | Employee | Date Hired | Date Term | Fund | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | KERN, VINCE D | | | Retirement | 1 | 2 | 2 | 1 | 1 | | 1 | 4 | 2 | 3 | 3 | 1 | 21 |
| 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 | LEADINGHOUSE, TYLER | | | Retirement | 2 | | 1 | | | | | | | | 1 | | 4 |
| 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 | PREUSS, KEVIN | | | Retirement | | 1 | | 1 | | 1 | | 1 | 1 | 2 | 3 | | 10 |
| 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 | UNASSIGNED DRIVER | | | Retirement | | | | | | 1 | | 1 | | | | 2 | 4 |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | Total Retirement | | 3 | 3 | 3 | 2 | 1 | 2 | 1 | 6 | 3 | 5 | 7 | 3 | 39 |

|  | 2024 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6/1/23 | 6/1/24 | | | | | | | | | | | | | | | Total |
| Retirement | 270.00 | 285.00 | | | 810.00 | 810.00 | 810.00 | 540.00 | 270.00 | 570.00 | 285.00 | 1,710.00 | 855.00 | 1,425.00 | 1,995.00 | 855.00 | 10,935.00 |
| | | | Total | | 810.00 | 810.00 | 810.00 | 540.00 | 270.00 | 570.00 | 285.00 | 1,710.00 | 855.00 | 1,425.00 | 1,995.00 | 855.00 | 10,935.00 |

# Lumber Employees Local 786 Benefit Funds

Retirement Fund

Schedule of Discrepancies & (Credits) for                                      2025

Employer Name : R Way Trucking

Employer # :    11196

Compliance Audit Period :
January 1, 2021 to September 30, 2025

Address :       P.O. Box 586
                Morris, IL 60450          Date of Audit :      September 18, 2026
Contact :       Vince Kern
Telephone # :   (815) 693-7155                                                  James Rock
                                                                               Compliance Auditor(s)

| Soc. Sec # | Employee | Date Hired | Date Term | Fund | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 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 | KERN, VINCE D | | | Retirement | 1 | 2 | 1 | 1 | 5 | 4 | 4 | 5 | 4 | | | | 27 |
| 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 | PREUSS, KEVIN | | | Retirement | | | | | 5 | 4 | 4 | 5 | 4 | | | | 22 |
| 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 | UNASSIGNED DRIVER | | | Retirement | 1 | | | | 4 | 3 | 1 | 2 | | | | | 11 |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | | Retirement | | | | | | | | | | | | | |
| | | | Total Retirement | | 2 | 2 | 1 | 1 | 14 | 11 | 9 | 12 | 8 | | | | 60 |
| | 2025 | | | | | | | | | | | | | | | | |
| | | 6/1/24 | 6/1/25 | | | | | | | | | | | | | | Total |
| Retirement | 285.00 | 300.00 | | | 570.00 | 570.00 | 285.00 | 285.00 | 3,990.00 | 3,300.00 | 2,700.00 | 3,600.00 | 2,400.00 | | | | 17,700.00 |
| | | | Total | | 570.00 | 570.00 | 285.00 | 285.00 | 3,990.00 | 3,300.00 | 2,700.00 | 3,600.00 | 2,400.00 | | | | 17,700.00 |